IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

EQUAL EMPLOYMENT OPPORTUNITY          *
  COMMISSION
                                      *
          Plaintiff
                                      *

          vs.                            CIVIL ACTION NO. MJG-98-3246
                                      *
BROWNING-FERRIS, INC.
                                      *
          Defendant
*       *       *       *       *       *       *       *       *

## MEMORANDUM AND ORDER

The Court has before it Plaintiff's Motion for Summary

Judgment on Liability, Defendant's Cross Motion for Summary

Judgment, and the materials submitted by the parties related

thereto.  The Court finds a hearing unnecessary to resolve the

motions.


## I.    FACTUAL BACKGROUND

Plaintiff Equal Employment Opportunity Commission ("EEOC" or

"Plaintiff") brings this action on behalf of Deborah J. Brown

("Ms. Brown"), who was employed by Defendant Browning-Ferris,

Inc. ("BFI" or "Defendant"), a company that contracts with cities

and municipalities to collect, recycle, and dispose of waste.

Ms. Brown suffers from Crohn's Disease, a type of inflammatory

bowel disorder.

For nearly seven years, beginning in August of 1988, Ms.

Brown worked for BFI in different positions in which she was exposed to various types of trash. The EEOC contends that BFI illegally discharged Ms. Brown due to its fallacious belief that Ms. Brown's exposure to trash in her capacity as a BFI employee would compromise her health because of her Crohn's Disease and related medications.

During the tenure of her employment with BFI, Ms. Brown held several different positions and worked a variety of shifts, none of which included a traditional Monday through Friday work week. Plaintiff contends that Ms. Brown worked weekend, evening, and pre-dawn shifts and routinely worked overtime hours, sometimes as many as seventy-five hours per week.

Ms. Brown's first position at BFI was "parts runner", a job that entailed collecting parts needed for trucks, transporting those parts to and from the repair, cleaning the parts and the shop, and maintaining inventory of the parts. While a parts runner, Ms. Brown also assisted the compactor repair person in servicing large (room-sized) trash compactor units. These compactors contained "everyday garbage and trash", as opposed to medical or hazardous waste. Pl.'s Mot. for Summ. J. at 2.

While she was a BFI employee, Ms. Brown obtained her commercial driver's license; and, for approximately one year of

2

her tenure at BFI[1], she drove a boom truck -- i.e., a twenty-four foot truck with a boom used for placing and removing trash cans from the truck. See Brown Dep. at 97-98. When she was not driving the boom truck during this year, Ms. Brown continued to repair trash compactors. She also spent her non-truck-driving hours painting, welding, and performing truck repairs. In these roles, Ms. Brown engaged in lifting chains, trash can lids, and trash as well as walking, bending, pulling, and pushing. Ms. Brown was performing this combination of duties, which required repeated, prolonged exposure to large quantities of trash, when BFI terminated her employment.

In the early spring of 1989, several months after she began working for BFI, Ms. Brown was diagnosed with Crohn's Disease. Crohn's Disease is an autoimmune inflammatory bowel disease, wherein an individual's cells and bacteria destroy her own intestinal tissues. This causes a thickening of the intestinal wall and a narrowing of the bowel channel. Symptoms of the disorder include extreme abdominal pain, loss of appetite, weight loss, malnutrition, dehydration, fever, diarrhea, flatulence, and fatigue.

Ms. Brown's Crohn's Disease causes her to suffer from

---

[1]    The exact dates are not specified.

chronic diarrhea and loss of appetite and weight.[2]  Shortly after she was diagnosed in 1989, she missed two weeks of work at BFI. In the early to mid nineteen nineties, Ms. Brown had periodic flare-ups of her Crohn's Disease and had to have minor surgeries to drain intestinal abscesses.  On two occasions, she scheduled these surgeries for a Friday and returned to work the following Monday.  In 1994, she missed approximately three weeks of work because of a surgery to drain her abscesses.

Plaintiff contends that despite Ms. Brown's periodic flare-ups, her Crohn's Disease did not interfere with her employment at BFI.  When she was experiencing a flare-up, Ms. Brown would sharply reduce her food intake during work hours in order to limit bowel activity.  Plaintiff also contends that Ms. Brown did not attempt to hide her Crohn's Disease from BFI.  See Brown Dep. 143-44.  Ms. Brown routinely visited BFI's Human Resources ("H.R.") Department to pick up medical insurance forms for Crohn's-related doctor appointments, and she remembers having casual conversations about her disease with BFI H.R. employees when she was there.  See id.  She believed H.R. Manager Karen Huusko ("Huusko") either participated in or at least heard these conversations and was aware that Ms. Brown had Crohn's Disease.

---

[2]     For example, she was diagnosed with the disease after an involuntarily weight loss of forty pounds.

4

See id.  Also, Ms. Brown regularly advised BFI's safety
department about her Crohn's medications to ensure that she could
remain certified for her commercial driver's license.  See id.
144-45.

BFI contends that in early 1995, Ms. Brown's supervisor, Mr.
Terry Friskey ("Friskey"), noticed that Ms. Brown had been absent
on numerous occasions over a twelve-month period.  Upon asking
Ms. Brown about these absences and purportedly learning of her
Crohn's Disease for the first time, BFI had Doctor Antonio
Talusan ("Dr. Talusan") conduct a fitness-for-duty evaluation of
Ms. Brown in January of 1995.  After conducting the evaluation,
Dr. Talusan concluded in written findings that it was dangerous
for Ms. Brown to be exposed to BFI waste because her Crohn's
Disease and related immuno-suppressive medication made her
especially susceptible to infection.  Dr. Talusan therefore
recommended that Ms. Brown be removed from her job because
prolonged and repeated exposure to BFI waste could lead to
serious health complications and possibly even death.

BFI contends that after receiving Dr. Talusan's evaluation,
it attempted but was unable to find Ms. Brown another job within
the company for which she was qualified and which would not
require repeated, prolonged exposure to waste.  In reliance on
Dr. Talusan's opinion that Ms. Brown's current position at BFI

5

could lead to serious health problems, BFI terminated Ms. Brown's
employment on February 7, 1995, approximately two weeks after Dr.
Talusan evaluated her.

Plaintiff contends that in early January of 1995, following
a two-day absence due to a non-Crohn's related stomach flu, Ms.
Brown was called to a meeting with her supervisor, Friskey, and
H.R. Manager Huusko. At the meeting, Friskey and Huusko
questioned Ms. Brown about her absence. When she told them that
it was due to a stomach flu, they advised her that they needed to
check on the status of her Crohn's Disease and advised her that
her position would be terminated if she did not sign a medical
release. Plaintiff contends that Ms. Brown signed the release
and was involuntarily placed on unpaid leave of absence.

A week later, Huusko informed Ms. Brown that she could not
return to work until she underwent a physical examination by Dr.
Talusan to see if she was physically fit to perform her job.
Plaintiff contends that just three months earlier, another doctor
from Dr. Talusan's clinic had examined Ms. Brown and determined
that she was fit for duty. Nevertheless, Ms. Brown was examined
again on January 25, 1995, this time by Dr. Talusan himself.

Plaintiff contends that Dr. Talusan examined Ms. Brown for
fifteen minutes, asking routine questions that Ms. Brown had been
asked during previous examinations, to which she gave the same

6

answers. Specifically, she informed the doctor that her Crohn's Disease caused her to experience chronic diarrhea and tenderness in one area of her stomach, and that she was taking Prednisone, which is an anti-inflammatory steroid, and Imuran, an immunosuppressant which also reduces inflamation and reduces a patient's need for Prednisone. (Plaintiff contends Ms. Brown had provided another doctor in Dr. Talusan's clinic with the same information during the examination three months prior.) As noted above, shortly after the examination, Dr. Talusan prepared written findings in which he indicated that Ms. Brown should not be exposed to waste because of her disease and the immunosuppressive medication she was taking. Approximately two weeks later, BFI fired Ms. Brown.

Shortly after learning of Dr. Talusan's determination, Ms. Brown's own physician and Crohn's Disease specialist, Doctor Jeffrey Garbis[3] ("Dr. Garbis"), telephoned Dr. Talusan to inform him that Ms. Brown's exposure to trash did not impact her physical condition.[4] Dr. Garbis also sent letters to Huusko and Dr. Talusan to this effect after learning that BFI terminated Ms. Brown. In the letter, Dr. Garbis stated, "The opinion that [Ms.

---

[3]     No relation to the presiding Judge.

[4]     It is not clear whether this call was made before or after BFI fired Ms. Brown.

7

Brown] is immunosuppressed by her low dosage of Imuran and runs

an increased risk for infection is inaccurate." Letter from

Garbis to BFI of 2/14/95.

A week after she was terminated, Ms. Brown received a letter

from her surgeon, Dr. James Zalucki ("Dr. Zalucki"), in which he

stated that her Crohn's-related flare-ups were in no way related

to her trash removal duties. Letter from Zalucki to Whom it May

Concern of 2/13/95. Plaintiff contends that Ms. Brown gave this

letter to H.R. Manager Huusko, but Ms. Brown's termination

remained final.

## II.   PROCEDURAL BACKGROUND

On September 25, 1998, Plaintiff EEOC filed the instant

action on Ms. Brown's behalf, alleging a cause of action under

the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §

12101 et seq. On July 2, 1999, this Court granted BFI's Motion

to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of

Civil Procedure. Plaintiff appealed, and on July 28, 2000, the

Fourth Circuit Court of Appeals vacated the order of this Court

and remanded the case for further proceedings. By its instant

Motion, Plaintiff seeks summary judgment on the issue of

liability. Defendant, by its instant Motion seeks summary

judgment as to the entire matter.

III. **LEGAL STANDARD**

In deciding a summary judgment motion, the Court must look beyond the pleadings and determine whether there is a genuine need for trial. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The Court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether the evidence is so one-sided that one party must prevail as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-53 (1986). If the Defendant carries its burden by showing an absence of evidence to support a claim, the Plaintiff must demonstrate that there is a genuine issue of material fact for trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 324-25 (1986).

An issue of fact must be both genuine and material in order to forestall summary judgment. An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict in favor of the Plaintiff. See Anderson, 477 U.S. at 248. An issue of fact is material only if the establishment of that fact might affect the outcome of the lawsuit under governing substantive law. See id.

IV.  DISCUSSION

The ADA was enacted to eliminate discrimination against individuals with disabilities and provides, in pertinent part:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).

Entities covered by the ADA include employers, employment agencies, labor organizations, and joint labor-management committees.  42 U.S.C. § 12111(2).  It is not disputed that Defendant BFI is a covered entity.

Plaintiff EEOC alleges that Ms. Brown was discharged by BFI because of her Crohn's Disease in violation of the ADA.  To establish a prima facie wrongful discharge claim under the ADA against BFI, the EEOC must demonstrate that:

1)   Ms. Brown is within the ADA's protected class;

2)   she was discharged;

3)   at the time of her discharge, she was performing her job at a level that met BFI's legitimate expectations; and

4)   her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination.

See Haulbrook v. Michelin N. Am., 252 F.3d 696, 702 (4th Cir.

2001) (citing Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, 53 F.3d

55, 58 (4th Cir. 1995)); Rhoads v. F.D.I.C., 257 F.3d 373, 387,

n.11 (4th Cir. 2001).[5]

It is not disputed that BFI discharged Ms. Brown, and that

it did so because of her Crohn's Disease.  However, BFI contends

that Plaintiff fails to establish the remaining elements of its

prima facie case.  If Plaintiff offers evidence sufficient to

establish a prima facie ADA claim, the burden shifts to BFI to

establish that it did not discriminate on the basis of disability

or that one of the defenses specified in section 12113[6] of the

ADA applies.

---

[5]     Both parties cite the test for establishing a prima
facie wrongful discharge claim under the ADA articulated in a
1995 Fourth Circuit decision, Doe v. Univ. of Md. Med. Sys.
Corp., 50 F.3d 1261 (4th Cir. 1995), which differs from the test
articulated in Haulbrook and Rhoads as follows.  According to
Haulbrook, 252 F.3d 696, 702, and Rhoads, 257 F.3d 373, 387,
n.11, which are 2001 decisions, plaintiff establishes a prima
facie case by demonstrating, in addition to the other elements,
that she was discharged under circumstances that raise a
reasonable inference of unlawful discrimination.  Doe, on the
other hand, requires plaintiff to show that she was discharged
solely on the basis of her disability.  50 F.3d 1261, 1264-65.
The Court will apply the more recent test articulated by the
Fourth Circuit in Haulbrook and Rhoads.

[6]     Unless otherwise specified, all section references
herein are to section 42 of the United States Code.

A.    **Plaintiff's Prima Facie Case**

1.    **Individual Within the ADA's Protected Class**

To establish the first element of its prima facie case,
Plaintiff must show that Ms. Brown is an individual with a
disability within the meaning of the ADA.  See 42 U.S.C. §
12112(a).  The ADA defines "disability" as:  1) an actual mental
or physical impairment that substantially limits one or more of
the major life activities of an individual; 2) a record of such
an impairment; or 3) being regarded as having such an impairment.
Id. at § 12102(2).

Plaintiff contends that Ms. Brown is disabled within the
meaning of the ADA because Defendant regarded her as being
disabled.  Specifically, Plaintiff contends that BFI placed Ms.
Brown on leave without pay and soon thereafter discharged her
because of its misperception that her Crohn's Disease and related
medications made it dangerous for her to work around waste.

Plaintiff notes that because Ms. Brown believes she was
always capable, without accommodation, of performing the
essential functions of her position, the EEOC chose to plead this
case under the third prong of the ADA definition -- i.e.,
"regarded as" being disabled.  However, Plaintiff contends in a
footnote that Crohn's Disease is a disability under prong one of
the ADA definition -- i.e., an actual mental or physical

12

impairment that substantially limits one or more of the major

life activities of an individual.   Pl.'s Mot. for Summ. J. at 9,

n.5.

Plaintiff appears to be under the misimpression that by

establishing that Ms. Brown has an actual ADA prong one

disability, it risks conceding that Ms. Brown was unable to

perform the essential functions of her job at BFI.   Plaintiff

need not make such a concession in order to make the claim that

Ms. Brown is actually disabled under the ADA.   In the instant

case there is evidence adequate to establish that Ms. Brown's

Crohn's Disease is an actual disability under the ADA -- i.e.,

the disease substantially limits her in the major life activities

of moving her bowels and eating.   Hence, it is not necessary for

the Plaintiff to rely solely upon a "regarded as" claim which

appears to be considerable weaker than a claim based upon an

actual disability.

Moreover, the regulations interpreting the ADA[7] imply that

---

[7]    After the ADA was passed, the EEOC issued regulations
and interpretive guidelines to provide additional guidance
regarding the proper interpretation of the term "disability" and
other parts of the ADA.   Section 12116 of the ADA specifically
authorizes the EEOC to issue such regulations.   On one occasion,
the Supreme Court rejected an EEOC guideline.   See Sutton v.
United Airlines, 527 U.S. 471 (1999) (rejecting EEOC's guideline
precluding mitigating measures from consideration when evaluating
whether an individual is disabled under the ADA).   The Court also
suggested that the Commission may have exceeded its authority by

the "regarded as" prong is to be used as a last resort: "if an individual cannot satisfy either the first part of the definition of 'disability' or the second 'record of' part of the definition, he or she may be able to satisfy the third part [i.e., the "regarded as" prong] of the definition." 29 C.F.R. § 1630.2(l). At any rate, though the Court will analyze the prima facie ADA claim under the prong one definition for the purposes of resolving the instant summary judgment motions, "plaintiff can proceed to trial without deciding under which prong she is covered." <u>Workman v. Frito-Lay, Inc.</u>, 165 F.3d 460, 467 (6th Cir. 1999).

Other courts have found that Crohn's Disease sufferers are individuals within the meaning of the ADA prong one definition. For example, in <u>Wilder v. Southeastern Pub. Serv. Auth.</u>, 869 F.Supp. 409 (E.D.Va. 1994), <u>aff'd.</u>, 69 F.3d 534 (4th Cir. 1995), the plaintiff, an African-American Crohn's Disease sufferer, contended that he had experienced various adverse employment actions on the basis of his race and disability in violation of 42 U.S.C. §2000e <u>et seq.</u> and the ADA.  The court stated, without

---

interpreting the term "disability".  <u>See</u> <u>id.</u>  Nevertheless, "courts normally defer to the EEOC's regulations and guidelines . . . except where they are viewed to be contrary to law."  Barbara Lindemann & Paul Grossman, Employment Discrimination Law 1208 (3d ed. 1996 & Supp. 2000).

discussion, "it is undisputed that . . . Wilder's Crohn's Disease constitutes a disability."  869 F.Supp. at 417.

In <u>Nesser v. Trans World Airlines, Inc.</u>, 160 F.3d 442 (8th Cir. 1998), the plaintiff employee suffered from Crohn's Disease and was fired for excessive absenteeism due to Crohn's-related problems.  The Eighth Circuit Court of Appeals affirmed the district court's grant of summary judgment to defendant TWA on the ground that the plaintiff failed to show that he was qualified to perform his essential job functions with or without reasonable accommodations.  However, when analyzing whether plaintiff had established a prima facie ADA claim, the court stated, again without discussion, that "it is clear that Nesser, who suffers from Crohn's Disease, is disabled within the meaning of the ADA".  <u>Id.</u> at 445.

Similarly, in <u>Davis v. Guardian Life Ins. Co. of Am.</u>, No. CIV.A.98-5209, 2000 WL 122357 (E.D.Pa. Feb. 1, 2000), the plaintiff, Davis, had Crohn's Disease, which forced her to miss a significant number of work days.  <u>See</u> <u>id.</u> at *1.  In pursuing her failure to reasonably accommodate ADA claim, Davis established that she was within the ADA's protected class on the ground that her Crohn's Disease was a disability under prong one of the ADA definition -- i.e., it substantially limited her in a major life activity.  See <u>id.</u> at *3; 42 U.S.C. § 12102(2).  As in <u>Wilder</u>,

15

869 F.Supp. 409, and <u>Nesser</u>, 160 F.3d 442, the court did analyze
the issue.   <u>See</u> 2000 WL 122357, at *3.   Nevertheless, none of
these courts doubted that Crohn's Disease was sufficient to bring
the plaintiffs within the ADA's protected class under the
statute's prong one definition of disability.

In the instant case, Plaintiff has presented evidence from
which a reasonable jury could[8] find that Ms. Brown's Crohn's
Disease renders her disabled under prong one of the ADA
definition -- that she is substantially limited in the major life
activities of moving her bowels and eating.   As stated above, the
ADA prong one definition of disability is an actual mental or
physical impairment that substantially limits one or more of the
major life activities of an individual.   42 U.S.C. § 12102(2).
It cannot be disputed that Ms. Brown Crohn's Disease is an actual
physical impairment -- i.e., a "physiological disorder, or
condition . . . affecting one or more of the following body
systems: . . . digestive".   29 C.F.R. § 1630.2(h).

Under the ADA, "substantially limited" means, inter alia,
unable to perform or "significantly restricted as to the
condition, manner or duration under which an individual can
perform a particular major life activity as compared to the

---

[8]      But, not must.

16

condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1).

Examples of "major life activities" are "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). Whether an individual has a disability within the meaning of the ADA is to be determined on a case-by-case basis. See Sutton v. United Airlines, 527 U.S. 471, 483 (1999). The fact that a person with a particular impairment was found to have a disability under the ADA in one case does not mean that another individual with the same impairment is necessarily an individual with a disability under the ADA. See id. Moreover, when evaluating whether an individual is substantially limited in a major life activity, courts are to consider mitigating measures, such as medication, and their positive and negative impact on the activity. See Sutton, 527 U.S. 471, 491; Murphy v. United Parcel Serv., Inc., 527 U.S. 516, 521 (1999) (plaintiff not substantially limited in any major life activity because high blood pressure was completely controllable with medication).

Although moving one's bowels and eating are not included as examples of major life activities on the above-detailed list in the regulations, the list is not meant to be exhaustive. See 29

17

C.F.R. § 1630.2(i) ("Major Life Activities means functions <u>such</u> <u>as</u> caring for oneself")(emphasis added).  Moreover, moving one's bowels and eating are certainly among "those basic activities that the average person in the general population can perform with little or no difficulty."  EEOC Interpretive Guidance, ADA Title I & 29 C.F.R. § 1630.2(i).  Indeed, other courts have found that moving or controlling one's bowels could qualify as a major life activity with the meaning of the ADA.  <u>See</u>, <u>e.g.</u>, <u>Workman v.</u> <u>Frito-Lay, Inc.</u>, 165 F.3d 460, 467 (6th Cir. 1998) ("Regarding the first prong, actual disability, the jury could have decided that controlling one's bowels is a major life activity" in which employee with irritable bowel syndrome was significantly restricted); <u>Mazza v. Bratton</u>, 108 F.Supp.2d 167, 174 (E.D.N.Y. 2000), <u>aff'd.</u> 2001 WL 363513 (2nd Cir. 2001) (plaintiff with colitis substantially limited in his ability to perform the major life activity of eliminating waste).

Plaintiff's evidence establishes that, because of her Crohn's Disease, Ms. Brown suffers from chronic severe diarrhea and loss of appetite and weight.  <u>See</u> Brown Dep. 123-24.  She was first diagnosed with Crohn's following an involuntary weight loss of forty pounds.  <u>See</u> Pl.'s Ex. 8, excerpts from medical records, at 1.  In the first few years following her diagnosis, Ms. Brown had several surgeries to drain abscesses in her intestines.  <u>See</u>

id. at 16; Brown Dep. 127-28. Since being fired from BFI in 1995, she has had part of her intestinal tract removed and had a colostomy bag attached to her colon for the removal of waste from her body. See id. at 67-68. Some days she cannot eat any food. See Brown Dep. 124. This is both because she often has no appetite and because she avoids eating in social situations or at work to avoid having uncontrollable diarrhea. The following deposition testimony is illustrative.

> Q: Would it be fair to say that your
>    Crohn's disease affects when you can eat
>    what you want to eat?
>
> A: Yes, it does.
>
> Q: Is that a fair way to characterize it,
>    though?
>
> A: Yes and no. I don't eat during the day.
>    I eat when I go home and I'm in my home
>    for the day, is when I eat something.
>
> Q: Why is that?
>
> A: Because I have severe diarrhea. I do --
>    I do go on myself and at least I am
>    close to a bathroom and I have a change
>    of clothes if I need them.

Brown Dep. 202-203.

In addition to affecting her ability to control her bowel movements, Ms. Brown's Crohn's Disease sharply limits what she is able to eat. She testified during her deposition:

> I don't have an appetite. I eat because I

> know I have to eat something.  At least -- I
> try at least once a day to eat something. . .
> .  It's pretty much a bland diet. . . . No
> fried foods, no spicy foods, no nuts, no
> chocolates, no caffeine.  No vegetables.  I
> have to do like a vegetable a day or a
> vegetable every couple of days or a couple of
> weeks to see how it affects me.  I pretty
> much know what I can.  And pretty much no
> matter what I eat even with their bland diet
> I still have severe diarrhea.

Brown Dep. 203-204.

At various times since her Crohn's Disease was diagnosed,
Ms. Brown has taken Prednisone, Imuran, Asacol, Cipro, and other
medications the names of which she cannot recall.  See id. at
117.  There is no evidence that any of these medications
mitigates the effect that Crohn's Disease has on Ms. Brown's
ability to move her bowels or eat such that the analysis of
whether she is disabled under the ADA would be different because
of them.

From the foregoing evidence, a reasonable jury could
conclude that Ms. Brown is "significantly restricted as to the
condition, manner or duration under which [she can move her
bowels or eat] as compared to the condition, manner, or duration
under which the average person in the general population can
perform th[ose] same major life activit[ies]."  29 C.F.R. §
1630.2(j)(1).  In other words, a jury could find that Ms. Brown
is an individual with a disability under the ADA because her

Crohn's Disease renders her substantially limited in one or more
major life activity.

### 2.   <u>Ms. Brown was Otherwise Qualified</u>

In order to survive summary judgment for Defendant BFI,
Plaintiff must also present evidence from which a reasonable jury
could find that, at the time of her discharge, Ms. Brown was
performing her job at a level that met BFI's legitimate
expectations.  <u>See</u> <u>Haulbrook</u>, 252 F.3d 696, 702.  Put
differently, Plaintiff must show that Ms. Brown was otherwise
qualified for her job at BFI.  <u>See</u> 42 U.S.C. § 12112(a)
(prohibiting discrimination against a <u>qualified</u> individual with a
disability) (emphasis added).

The ADA defines an otherwise qualified individual with a
disability as "an individual with a disability who, with or
without reasonable accommodation, can perform the essential
functions of the employment position that such individual holds.
. .".  42 U.S.C. § 12111(8).  The employer's judgment as to what
functions of the job are essential is to be considered in this
analysis.  <u>See</u> <u>id.</u>

BFI does not appear to contend that Ms. Brown failed to meet
its legitimate expectations and does not contend that it fired
her because she was performing unsatisfactorily.  Although BFI

makes a general comment regarding Ms. Brown's "excessive absenteeism", it does not present evidence establishing, beyond question, that she was excessively absent.  Def.'s Opp'n & Cross Mot. for Summ. J. at 7.  On the other hand, Plaintiff presents evidence sufficient to raise genuine issues of material fact as to whether Ms. Brown was excessively absent.

A reasonable jury could conclude from Plaintiff's evidence that Ms. Brown was performing at least satisfactorily when she was fired.  For example, four to five months before she was fired, Ms. Brown received a three percent pay increase.  Brown Dep. 99.  Ms. Brown's supervisor, Friskey, stated during his deposition that it was within his discretion to give pay increases -- i.e., he could give one employee a four percent increase and another employee nothing.  Friskey Dep. 98.  Friskey testified that he used the following factors to determine whether an employee got a pay increase: "[w]ork ethics, time being there as being one, how good their work was or wasn't done, and through an evaluation form that I did."  Id.

BFI neither alleges nor offers evidence that an employee would receive a pay increase if he or she were not performing satisfactorily.  A jury could thus conclude that if Ms. Brown received a three percent pay increase, she was performing at least satisfactorily.  Moreover, on Ms. Brown's Record of

Employment Separation, BFI checked the "lack of work" box to indicate the reason it fired Ms. Brown. See Pl.'s Ex. 18. It did not check the "absenteeism", "tardiness", "insubordination", or "not qualified" boxes. See id. Furthermore, if Ms. Brown was not meeting BFI's expectations, either because of excessive absenteeism or some other reason, it presumably would not have attempted to find another position for her at BFI as it contends it did. In sum, there are genuine questions of materials fact precluding summary judgment on the question of whether Ms. Brown was meeting BFI's legitimate expectations when fired.

BFI contends that Ms. Brown was not qualified to perform her job because Dr. Talusan determined that, for Ms. Brown's own safety, she could not be exposed to large quantities of waste on a repeated and prolonged basis. Without overtly stating so, BFI essentially contends that Ms. Brown could not perform the essential function of performing her job without posing a direct threat of harm to herself.[9] The ADA permits an employer to define as a job qualification the requirement that "an individual . . . not pose a direct threat to the health or safety of [the individual him or herself or] other individuals in the

---

[9]    BFI presents this argument in the context of its "Direct Threat" affirmative defense. However, it applies equally to the present discussion. For the sake of efficiency, the Court will discuss the issue here.

workplace." 42 U.S.C. § 12113(b); 29 C.F.R. § 1630.2(r) (adding

"the individual him or herself" to the definition).

The risk of a direct threat of harm, however, must be

significant.  See id.  An employer may not

> deny an employment opportunity to an
> individual with a disability merely because
> of a slightly increased risk.  The risk can
> only be considered when it poses a
> significant risk, i.e., high probability, of
> substantial harm; a speculative or remote
> risk is insufficient.

EEOC Interpretive Guidance on 29 C.F.R. § 1630.2(r).

The determination of whether an individual poses a direct

threat of harm must be based on a case-by-case "assessment of the

individual's present ability to safely perform the essential

functions of the job".  29 C.F.R. § 1630.2(r) (emphasis added).

It must not be based on stereotypes or generalizations about the

effects of a disability.  See id.; Montalvo v. Radcliffe, 167

F.3d 873, 876 (4th Cir. 1999).

> This assessment shall be based on a
> reasonable medical judgment that relies on
> the most current medical knowledge and/or on
> the best available objective evidence.

29 C.F.R. § 1630.2(r); See Montalvo, 167 F.3d at 876-77 ("An

individualized assessment, based on reasonable judgment that

relies on current medical knowledge or on the best available

objective evidence" must be made).

24

The following factors are to be considered when the determination of whether the individual poses a significant risk to herself is made: the duration of the risk; the nature and severity of the potential harm; the likelihood that the harm will occur; and the imminence of the potential harm. See 29 C.F.R. § 1630.2(r). Evidence relevant to the direct threat determination

> may include input from the individual with a
> disability, the experience of the individual
> with a disability in previous similar
> positions, and opinions of medical doctors,
> rehabilitation counselors, or physical
> therapists who have expertise in the
> disability involved and/or direct knowledge
> of the individual with the disability.

EEOC Interpretive Guidance on 29 C.F.R. § 1630.2(r).

It is not disputed that repeated and prolonged exposure to large volumes of waste was an essential function of Ms. Brown's job. In determining that Ms. Brown could not perform this function without posing a direct threat of harm to herself, BFI relied exclusively on Dr. Talusan's opinion that such exposure would have been especially dangerous to Ms. Brown because of her Crohn's Disease and related medications. Letter from Talusan to Husko of 1/25/95 ("Talusan Letter"); Def.'s Cross Mot. for Summ. J. at 15.

Dr. Talusan is an internist who spent a significant part of his career in the Philippines studying and treating people with

25

kidney diseases.  See Talusan Dep. 8.  In 1987, he began
practicing occupational medicine in a clinic in the United
States.  See id.  At the time he examined Ms. Brown, Dr. Talusan
and the two other doctors in the clinic saw approximately 80 to
120 patients per day through contractual arrangements with
clients such as BFI.  See id. at 15-17.  In this capacity, Dr.
Talusan conducted pre-employment physicals, fitness for duty
evaluations, and drug testing and treated people for work-related
injuries.  See id.

       According to Dr. Talusan's own testimony, he is neither a
Crohn's specialist nor a gastroenterologist and has not treated
Crohn's patients for over forty years.  Talusan Dep. 24-25.  When
asked what kind of experience he has had with regard to treating
the disease, he stated:

              A:   Treating Crohn's disease? Limited. I would say
                   that it was during my training years here and as a
                   resident trainee in medicine that I have seen,
                   experienced, and treated people with Crohn's
                   disease.

              Q:   So we're talking about from 1956 through
                   1961?

              A:   That's correct, ma'am.

                              * * *

              Q:   So you don't consider yourself an expert
                   in Crohn's disease?

              A:   I would not say so.

                              26

<u>Id.</u>

Dr. Talusan is familiar with Prednisone and Imuran, the two medications he believed, in conjunction with Crohn's Disease, caused Ms. Brown to pose a direct threat of harm to herself. <u>See id.</u> at 26. He spent a significant part of his career prescribing Prednisone to kidney disease patients in the Philippines. <u>See id.</u> He primarily prescribed the drug to kidney transplant recipients for the purpose of suppressing the immune system in order to reduce the likelihood of the body rejecting the new kidney. <u>See id.</u> at 27. He also prescribed Imuran for the same purpose during the years that he treated kidney disease patients. <u>See id.</u> at 29. Since approximately 1987, when he stopped his kidney disease practice, Dr. Talusan has prescribed Prednisone only very rarely, and usually only to treat temporary allergic reactions such as those caused by bee stings or plastic gloves. <u>Id.</u> at 27-28.

Dr. Talusan made his determination about Ms. Brown by considering:

> I.    his own approximately fifteen-minute
>       meeting with Ms. Brown[10];

---

[10]    During which he checked her ears, nose, throat, and blood pressure, had Ms. Brown run in place, checked her blood pressure again, listened to her chest and heart, and talked with Ms. Brown about her Crohn's Disease.

> II.   his experience with Prednisone and
>       Imuran;
>
> III.  his research on Crohn's Disease;
>
> IV.   his review of Ms. Brown's medical
>       records made by her Crohn's Doctors,
>       Zalucki and Garbis, and her primary care
>       physician, Dr. Bruce Conger; and
>
> V.    Ms. Brown's Crohn's related absences and
>       surgeries while employed by BFI.

See Def.'s Opp'n & Cross Mot. for Summ. J. at 29.   Though Dr.
Talusan reviewed their medical records of Ms. Brown, he did not
consult any of the doctors who had been and were currently
treating Ms. Brown for her Crohn's Disease.

BFI contends that when H.R. Manager Huusko asked Dr. Talusan
to examine Ms. Brown, she authorized him to send Ms. Brown to a
specialist if he deemed it necessary to determine whether she was
fit for duty.   See Abell[11] Dep. 100.   Dr. Talusan does not recall
receiving such authorization.   See Talusan Dep. 111-113.
Regardless, Dr. Talusan saw no need to send her to a specialist;
and no specialist was consulted.   See id. at 112.

Dr. Talusan's research on Crohn's Disease in relation to his
evaluation of Ms. Brown consisted of reading two medical

---

[11]     Apparently, Ms. Huusko's name changed to Abell at some
point.

textbook[12] articles on the disease.  Dr. Talusan testified at his
deposition that neither article discussed a Crohn's sufferer's
external environment nor their susceptibility to infection.
Talusan Dep. 89.  He admitted that he was not aware of any
literature addressing whether such external environmental factors
impacted persons with Crohn's Disease, and he did not conduct any
literature search on the matter.  Id. at 56-57.  Dr. Talusan
stated that what concerned him after reading these articles was
the risk of peritonitis and sepsis in Crohn's patients, which can
cause death.  Id. at 91.  He believed that Ms. Brown was at an
increased risk of contracting peritonitis and sepsis because of
her exposure to waste at BFI.

    In his written findings, Dr. Talusan concluded, in pertinent
part:

> [Ms. Brown] has been on immunosuppressive
> therapy since 1990 . . . [which] would
> depress the individual's ability to defend
> against infection.
>
> Crohn's Disease is a lifelong disease which
> would require lifetime treatment.
> Complications such as what Ms. Brown has had
> must be minimized.  This may lead to life-
> threatening consequences such as perforations
> and intestinal obstructions.

_____

[12]    The articles were contained in general medical
textbooks:  The Textbook of Medicine by Harrison; and The
Textbook of Medicine by Cecil & Lloyd.

> When Ms. Brown's job description was
> reviewed, it was noted that she would be
> exposed to the bacteriologic risk in waste.
> Ms. Brown, with her Crohn's disease and
> immunosuppressive treatment would, therefore,
> be exposed to the prolonged and repeated risk
> of infection. She has had three infection
> complications of her Crohn's disease in two
> (2) years.
>
> I, therefore, hereby conclude that Ms. Brown,
> with Crohn's disease and on immunosuppressive
> therapy, will be unable to perform her
> present job description. A reasonable
> accommodation is, therefore, recommended by
> removing her from the bacteriologic risk
> offered by waste exposure.

Talusan Letter at 2.

Regarding why he believed that Ms. Brown was at an increased
risk of harm at BFI, Dr. Talusan stated, "I think simple logic
would suggest that when you're working in an infected area, you
have a higher chance of getting infection". Talusan Dep. 98. He
also commented on the Crohn's-related surgeries Ms. Brown had
during the years preceding her termination by BFI, characterizing
them as warning signs that Ms. Brown was heading into problems
and noting that he would not want her, while on immunosuppressive
medications, to be subjected to the increased risk of infection
presented by the large quantities of waste at BFI. See id. at
102. Dr. Talusan admitted that these surgeries may have been
necessary simply because of the Crohn's Disease itself, but his
testimony and his written findings indicate his belief that there

30

was a connection between the surgeries, Ms. Brown's immuno-
suppressant medications, and her exposure to trash at BFI.  Id.
at 103.

Dr. Talusan found no medical basis on which to "quantitate"
how long Ms. Brown would need to be exposed to BFI waste in order
to get a trash-related infection.  See Talusan Dep. at 66.  He
simply stated, "the more you are exposed, the more chances, the
longer you're exposed, the longer the chance, the better or the
higher are the chances you can develop the infection".  Id.

Though the likelihood that harm would occur was
unquantifiable, Dr. Talusan believed the nature of the risk was
very severe.  He testified that Crohn's Disease has a five to ten
percent mortality rate.  Id. at 67.  Dr. Talusan's "medical
deduction of the chain of information" was that because of her
Crohn's Disease and her immuno-suppressant medications, Ms. Brown
was at risk of contracting sepsis and/or peritonitis, possibly
resulting in her death, by her continued exposure to waste at
BFI.  Id. at 92.

The doctors who have treated Ms. Brown for her Crohn's
Disease, Doctors Garbis and Zalucki, disagree with Dr. Talusan's
conclusion regarding the risk of harm posed to Ms. Brown by her
job at BFI.  For example, Dr. Zalucki, the surgeon who operated
on Ms. Brown to drain her Crohn's related abscesses, wrote the

following in a letter to BFI regarding the surgeries:

> Deborah J. Brown has Crohn's disease,
> which causes her gastrointestinal tract to
> intermittently become inflamed.  This
> inflammation allows bacteria, which are
> normally contained within the intestinal
> tract; [sic] the opportunity to cause
> infections in surrounding tissues.
>
> Thus, Ms. Brown's anorectal abscesses
> are a result of her Crohn's disease and are
> in no way related to her duties of trash
> removal.

Letter from Zalucki to Whom it May Concern of 2/13/95.

Dr. Garbis, a gastroenterologist and Ms. Brown's Crohn's
Disease treating physician since 1992, wrote a letter to BFI in
which he strongly disagreed with Dr. Talusan's opinion regarding
Ms. Brown's risk of infection at BFI.  Letter from Garbis to BFI
of 2/14/95.  He saw no reason why her exposure to trash at BFI
would jeopardize her health and stated that the opinion that her
immunosuppressant medication caused her to have an increased risk
of infection was inaccurate.  See id.

Plaintiff's expert, Dr. Bedine, is a gastroenterologist who
has worked with Crohn's patients for thirty years and conducted
his own physical examination of Ms. Brown.  In Dr. Bedine's
opinion, Ms. Brown's infections were caused by her Crohn's
Disease and had nothing to do with her exposure to trash at BFI.
Bedine Dep. at 30.  He has never felt that any of his Crohn's

32

patients on Prednisone and Imuran should consider not working in
a certain environment because of an increased risk of infection.
Id. at 16.  He believes there is no connection between a patient
with Crohn's Disease, where they work, and how many infections
they have.  Id. at 17.

Based on his experience with Crohn's Disease, his physical
examination of Ms. Brown, and his consideration of her history,
Dr. Bedine concluded that Ms. Brown "could continue her job,
[and] that there was no risk of developing complications from her
Crohn's Disease from continuing in that job."  Bedine Dep. at 27-
28.  He is not aware of any studies showing Crohn's patients
cannot perform normal work activity.  See id. at 29-30.  Because
of his knowledge of the disease and the level of Ms. Brown's
dosage of Prednisone and Imuran, Dr. Bedine found unreasonable
Dr. Talusan's conclusion that Ms. Brown was at a risk of
significant harm at BFI.  See id. at 29-30.  If there was any
risk that Ms. Brown was more likely to contract an infection from
exposure to BFI trash than a person without Crohn's Disease who
was not on immuno-suppressants, Dr. Bedine testified that any
such risk would be very small.  Id. at 45.

As noted above, BFI terminated Ms. Brown on February 7,
1995, approximately two weeks after Dr. Talusan examined her.
The decision was made strictly in reliance on Dr. Talusan's

33

opinion and because of BFI's purported inability to find Ms. Brown another job at BFI for which she was qualified for and which would not expose her to large quantities of trash on a prolonged basis. The letters from Ms. Brown's physicians were not received by BFI until after it decided to fire Ms. Brown, and there is no evidence that BFI sought input from Ms. Brown's doctors before deciding to fire her.

Based on the foregoing evidence, a reasonable jury could find that, by relying exclusively on Dr. Talusan's opinion in deciding to terminate Ms. Brown, Defendant BFI did not meet its legal requirements under the ADA to make a reasonably informed and considered employment decision. A jury could conclude that BFI's assessment of Ms. Brown, based entirely on the opinion of a physician with minimal experience treating Crohn's Disease patients who spent fifteen minutes examining Ms. Brown, was based on neither the most current medical knowledge or the best available objective evidence. See 29 C.F.R. § 1630.2(r).

It does not appear that BFI sought input from any medical doctors with expertise in the disability involved or doctors with any direct knowledge of Ms. Brown and her individual history with Crohn's Disease. See EEOC Interpretive Guidance on 29 C.F.R. § 1630.2(r). Nor did BFI appear to lend any credence to Ms. Brown's own belief that there was no significant risk. See id.

In sum, there are genuine issues of material fact on the question of whether BFI made a reasonably informed and considered determination, based on the most current medical knowledge and/or the best available objective evidence as well as an individualized assessment of Ms. Brown, that there was a significant risk that Ms. Brown posed a direct threat of harm to herself.

### 3. The Circumstances Raise a Reasonable Inference of Discrimination

The final element of Plaintiff's ADA claim is that Ms. Brown's discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. See Haulbrook, 252 F.3d 696, 702. The parties have not specifically briefed this issue because, as noted above, both rely on an earlier Fourth Circuit decision stating that, rather than showing circumstances raising a reasonable inference of unlawful discrimination, a plaintiff must demonstrate that she was fired solely on the basis of disability. See Doe v. Univ. of Md. Med. Sys. Corp., 50 F.3d 1261, 1264-65.

BFI concedes that it decided to fire Ms. Brown because of her Crohn's Disease but denies that it did so in violation of the ADA. Plaintiff has presented evidence sufficient to establish a

prima facie ADA claim -- i.e., that Ms. Brown is within the ADA's

protected class; she was discharged by BFI because of her Crohn's

Disease under circumstances that raise a reasonable inference of

discrimination; and at the time of her discharge, she was

performing her job at a level that met BFI's legitimate

expectations.  See Haulbrook, 252 F.3d 696, 702.


### B.    Defenses

BFI contends that it has an affirmative defense in that Ms.

Brown posed a direct threat of harm to herself.  BFI also

contends that it did not discriminate on the basis of Ms. Brown's

disability because it had a good faith belief that Ms. Brown

should have been terminated.


### 1.    Direct Threat Defense

Under the ADA,

> It may be a defense to a charge of
> discrimination . . . than an alleged
> application of qualification standards,
> tests, or selection criteria that screen out
> or tend to screen out or otherwise deny a job
> or benefit to an individual with a disability
> has been shown to be job-related and
> consistent with business necessity . . . .
> The term "qualification standards" may
> include the requirement that an individual
> shall not pose a direct threat to the health
> or safety [of the individual him or herself
> or] of other individuals in the workplace.

36

42 U.S.C. § 12113; <u>see</u> 29 C.F.R. § 1630.2(r) (adding "the individual him or herself").

The analysis of whether an individual poses a direct threat of harm to him or herself is no different in the context of an affirmative defense under the ADA than it is in considering whether an ADA complainant is qualified for her position.  As discussed above, there are genuine issues of material fact regarding whether Ms. Brown posed a direct threat of harm to herself.  BFI is thus not entitled to summary judgment on the ground that it has a "Direct Threat" affirmative defense.

2.    <u>BFI's Good Faith Reliance on Dr. Talusan's Opinion</u>

The remaining issue is whether BFI can establish a defense as a matter of law on the ground that it relied in good faith on Dr. Talusan's opinion.

As noted above, the ADA requires employers to conduct an individualized assessment of whether an individual with a disability poses a direct threat of harm before taking an adverse employment action.  29 C.F.R. § 1630.2(r).  This assessment must be "based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence."  <u>Id.</u>  In <u>Bragdon v. Abbott</u>, 524 U.S. 624,

37

649 (1998), the Supreme Court found that a good-faith belief that a significant risk of harm exists is insufficient if it is not grounded in medical or other objective, scientific evidence.  The Court stated that the defendant's "belief that a significant risk existed, even if maintained in good faith, would not relieve him from liability."  Id. at 649.

Defendant BFI contends that its good faith belief in Dr. Talusan's opinion is alone sufficient to exempt it from liability under the ADA.  Even assuming BFI could establish that it relied in good faith on Dr. Talusan's opinion, BFI cites no authority establishing that such good faith reliance, independent of whether the medical judgment was reasonable and based on the most current or objective medical knowledge, is a complete defense under the ADA.

The cases BFI relies on in support if its contention are unpersuasive.  For example, in Lowe v. Ala. Power Co., 244 F.3d 1305 (11th Cir. 2001), the defendant employer relied on its doctor's determination that the plaintiff-amputee could not perform his job safely.  The doctor made this determination on the basis of an approximately one hour examination of the plaintiff, an examination the court described as "cursory".  Id. at 1306.  The Eleventh Circuit reversed and remanded the district court's decision granting summary judgment to the employer

38

because it found that the defendant's determination, on the basis
of the doctor's cursory examination of the plaintiff, was not
based "on particularized facts using the best available objective
evidence as required by the regulations." Id. at 1309.

In Smith v. Chrysler Corp., 155 F.3d 799 (6th Cir. 1998),
the defendant employer relied on a letter from the employee's
physician diagnosing the employee with narcolepsy and fired the
employee for failing to disclose the condition on a pre-
employment medical questionnaire. The Sixth Circuit affirmed the
district court decision granting summary judgment to the employer
on the ground that even though it was mistaken, the employer had
a good faith belief that the employee lied on the questionnaire.
However, the court noted its rejection of the so-called "honest
belief rule" -- i.e., permitting the employer to escape ADA
liability if it honestly, albeit mistakenly, believed in its
proffered non-discriminatory reason for its employment decision--
to the extent that the defense allows an employer to make an
employment decision without ensuring that it is reasonably based
on particularized facts. Id. at 806.

> We find such an abstract application of the
> rule to be at odds with the underlying
> purpose behind the [ADA]--i.e., that
> employment actions taken regarding an
> individual with a disability be grounded on
> fact and not "on unfounded fear, prejudice,
> ignorance, or mythologies." 136 Cong. Rec. S

> 7422-03, 7437 (daily ed. June 6, 1990)
> (statement of Sen. Harkin).  To the extent
> the Seventh Circuit's application of the
> "honest belief" rule credits an employer's
> belief without requiring that it be
> reasonably based on particularized facts
> rather than on ignorance and mythology, we
> reject its approach.

Id. at 806.

To be sure, the ADA permits employers to rely on the
opinions of doctors in making employment decisions when such
opinions are reached on the basis of the type of individualized
assessment and medical knowledge or other objective evidence
described in the statute and regulations.  However, good faith
reliance on or an honest belief in a doctor's determination alone
is insufficient to exempt an employer from ADA liability.

Thus, even assuming BFI could produce evidence sufficient to
establish it relied in good faith on Dr. Talusan's opinion, this
would not as a matter of law establish that BFI met its
obligation under the ADA before terminating Ms. Brown.  As noted
above, there is evidence from which a jury could infer that Dr.
Talusan did not make a reasonably informed and considered
determination, based on an individualized assessment of Ms. Brown
and the most current medical knowledge or available objective
evidence.  BFI's good faith belief in Dr. Talusan's opinion would
not entitle it to summary judgment.

C.    Damages

BFI contends that is entitled to summary judgment on damages

issues because:

> 1.    There is no evidence that BFI acted with malice or
>        reckless indifference to Ms. Brown's federal
>        rights protected by the ADA.   See 42 U.S.C. §
>        1981a(b)(1).
>
> 2.    BFI made a good faith effort to accommodate Ms.
>        Brown.   See 42 U.S.C. § 1981a (a)(3).

Defendant makes the bald assertion that there is no evidence

of malice or reckless disregard.   Plaintiff seems to reserve the

right to present evidence to support its contentions in this

regard.   Neither party has adequately addressed the issue.   The

Court will provide Defendant with another chance to move for

summary judgment on this aspect of the motion so that it can be

addressed in light of evidence.

The accommodation argument is immaterial.   Plaintiff is not

basing a claim upon a failure to accommodate but seeks damages

for an alleged refusal to employ.

Accordingly, there shall be no summary judgment on damages

issues.

V.    CONCLUSION

For the foregoing reasons:

1.    Plaintiff's Motion for Partial Summary Judgment is
      DENIED.

2.    Defendant's Cross Motion for Summary Judgment is
      DENIED.

3.    Defendant may, by September 30, 2002, file a
      motion seeking summary judgment as to punitive
      damages if it finds that there are reasonable
      grounds to do so.

      a.    Plaintiff shall respond to said motion by
            providing references to specific evidence
            based upon which a reasonable jury could
            award punitive damages.

      b.    Plaintiff should take care to oppose the
            motion only if there is a reasonable basis to
            support the opposition.

      c.    The pendency of the motion will not delay the
            scheduling of the trial of this case.

4.    Plaintiff shall arrange a telephone conference by
      September 30, 2002 to set the date for trial of
      this case.

SO ORDERED this ___17th___ day of September, 2002.

                                    Marvin J. Garbis
                              United States District Judge

42